United States District Court
District of Connecticut
FILED AT   BRIDGEPORT

9 - 16 - 20__

Robin D. Tabora, Clerk

By_____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT

| | |
|---|---|
| STATE OF CONNECTICUT | : ss: Bridgeport, Connecticut |
| | : |
| | : September 16, 2020 |
| COUNTY OF FAIRFIELD | : |
| | : **Filed Under Seal**      20-mj-00794(WIG) |
| | : |

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Sarah Lingsch, being duly sworn, depose and state as follows:

### BACKGROUND OF AFFIANT

1.      I am a Special Agent with the Federal Bureau of Investigation. As such, I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant. I joined the FBI as an analyst in 2016 and have been a Special Agent since July 2017. Since April of 2019, I have been assigned to a unit that investigates La Cosa Nostra ("LCN"). As a Special Agent with the FBI, my responsibilities include investigations of a wide variety of offenses committed by LCN figures, including, as relevant here, the Subject Offenses. In the course of my work with the FBI, I have participated in the execution of search warrants, debriefing of informants, monitoring of wiretaps, and oversight of consensual recordings, amongst other investigative techniques.

2.      I make this Affidavit in support of an application pursuant to Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises described below and specified in Attachment A (the "Subject Premises") for, and to seize, the items and information described in Attachment B. This affidavit is based upon my personal knowledge; my review of documents and other evidence; my conversations with other law enforcement personnel; and my training and

1

experience investigating the Subject Offenses. Because this affidavit is being submitted for the limited purpose of establishing probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of others are reported herein, they are reported in substance and in part, except where otherwise indicated.

3.      For the reasons set forth herein, I have probable cause to believe and I do believe, that the items described in Attachment B, which constitute evidence, contraband, fruits, or instrumentalities of violations of the Subject Offenses, exist at the Subject Premises.

## THE SUBJECT PREMISES

4.      The Subject Premises are particularly described as a tan single-family home with white trim and a stone foundation, located at 1B Austin Drive, New Fairfield, CT.  (see Photograph below).  The front door of the Subject Premises is accessed via a walkway to a covered front porch surrounded by a white railing.  (see Photograph below)



## THE SUBJECT OFFENSES

5.      The Subject Offenses are racketeering conspiracy, in violation of 18 U.S.C.

§ 1962(d) and extortion (including extortionate extensions of credit, extortionate debt collection,

and financing of the same), in violation of 18 U.S.C. §§ 892, 893, 894, and 1951 (the "Subject

Offenses").

## INVESTIGATION BACKGROUND AND PROBABLE CAUSE

### *Background of the Investigation*

6.      Since in or about January 2019, the New York State Attorney General's Statewide

Organized Crime Task Force ("OCTF"), together with the King's County District Attorney's

Office ("KCDA"), have been investigating members and associates of the Genovese Family.  The

Federal Bureau of Investigation ("FBI") partnered with OCTF and KCDA in this investigation in

or about December 2019.  As part of the investigation, law enforcement have obtained state and

federal court authorization to intercept phone calls and text messages over various cellphones from

February 2019 through the present, including cellphones used by Target Subject Michael Messina

(collectively, the "Wiretaps").  Law enforcement has also been working with a confidential source

("CS-1"), who has provided both historical information about the targets of the investigation and

has made consensual recordings of meetings with certain of those targets, including Messina,

Ralph Balsamo, and Michael Poli.[1]



*LCN Background*

7.      La Cosa Nostra is also known as the "mafia," and the Genovese Family is one of six LCN Families operating in the New York City and New Jersey areas.  It is an organized criminal group that operates in the Southern District of New York and elsewhere.

8.      Each LCN Family operates through groups of individuals known as "crews." Each "crew" had as its leader a person known as a "Caporegime," "Capo," "Captain," or "Skipper," and consists of "made" members, sometimes known as "Soldiers," "wiseguys," "friends of ours," and "good fellows."  Members are aided in their criminal endeavors by other trusted individuals, known as "associates," who are sometimes referred to as "connected" or identified as "with" a member of the Family.  Associates participate in the various activities of the crew and its members. In order for an associate to become a made member of the Family, the associate typically needs to be of Italian descent and to demonstrate the ability to generate income for the Family and/or to commit acts of violence for the Family.

9.      Each Captain is responsible for supervising the criminal activities of his crew, resolving disputes between and among members of the Family, resolving disputes between members of that Family and members of other criminal organizations, and providing Soldiers and associates with support and protection.  In return, the Captain typically receives a share of the illegal earnings of each of his crew's Soldiers and associates, which is sometimes referred to as "tribute."

_____

███████████████████████████████████████████

10.     Above the Captains are the highest-ranking members of each Family, commonly referred to as the "Administration."  The head of each Family is known as the "Boss," who is ordinarily assisted by an "Underboss" and a "Consigliere," or counselor.  The Boss, Underboss, and Consigliere are responsible for, among other things, setting policy, resolving disputes between and among members of the Family, and resolving disputes between and among members of that Family and members of other criminal organizations.  The Administration of each Family is also responsible for overseeing the criminal activities of the Family's Captains, Soldiers, and associates, and is at times called upon to make decisions regarding those criminal endeavors.

11.     The Boss, Underboss, and Consigliere supervise, support, protect, and discipline the Captains, Soldiers, and associates, and regularly receive reports regarding their various activities.  In return for their supervision and protection, the Boss, Underboss, and Consigliere typically receive part of the illegal earnings of each crew.

12.     To affect LCN's goals, including maximizing wealth, members and associates engage in a host of criminal conduct, including extortion, loansharking, gambling, and other offenses.

*Loansharking and Extortion Background*

13.     Based upon my training, experience, and participation in this investigation, including information provided to me by other law enforcement officers participating in this investigation who have decades of experience investigating LCN and the Subject Offenses, I know the following:

a.  Loansharking involves lending money at excessive (often unlawful) rates of interest. Typically, interest is charged on a weekly basis and weekly payments are credited as

interest payments only (i.e., they do not reduce the principal).  Often, the loansharking victim will continue to make weekly interest payments for months or years before the loanshark will accept payment on the principal (a loan on which the borrower's payments are credited toward the principal is sometimes referred to as a "knockdown loan").  The weekly interest is called "vig" or "juice" and is measured in "points," a term that is used to describe a percentage point. For example, on a $10,000 loan at 5 points (5%), the vig would be $500 per week. Such loans effectively create a high-cost debt trap for loansharking victims.

b.   Furthermore, the practice of loansharking has a longstanding connection to extortion.  Not only is there generally an understanding between loansharks and their victims that if there is a delay in payments or a failure to repay the loan, then violence or other criminal means will be used to force repayment, but loansharks and their associates often do in fact use such means to collect outstanding debts.

c.   Moreover, loansharking has long been a lucrative and consistent source of revenue for LCN.

*Probable Cause Regarding Target Subject Michael Messina's Commission of the Subject Offenses*

14.   As detailed more fully below, there is probable cause to believe that Michael Messina (the "Target Subject" or "Messina") is a Soldier in the Genovese Family and that in connection with said membership, he engages in the Subject Offenses.

15.   ████████████████████████████████████████

████████████████████

███████████████████████████████

██████████████████████████████████████████████

7



████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

██████████████████████████████████████

████████████████████

16.     *Communications Intercepted Pursuant to the Wiretaps.*  As detailed below, the Wiretaps have confirmed Messina's participation in the Subject Offenses.

17.     The Wiretaps have included interceptions of conversations between Messina and various loansharking victims, or conversations about Messina's loansharking victims.   The following are some examples.

a.    On ███████████, at approximately 10:16 a.m., a phone call was intercepted between Messina and ████████████████████████, using telephone number ███ ███████ Line 6626, Ref # 49722).  The conversation is transcribed in part below: [2]

MM: Michael Messina
████████████████
U/I: Unintelligible

****

MM:   Today's a good day.

███ :    What happened?

_____

[2] All quotations contained in this affidavit are based on preliminary transcriptions of the conversations and are subject to revision upon further review of the conversations.

MM:     Uh, remember the spic? With, uh, Pat?

█████     The, uh, big goof?

MM:     Yeah. I got him.

****

MM:     He's six-foot-two, three hundred pounds. When he saw me, he got down on his knees. "Please, please, Mike. Don't hit me," he says. "Uh," he says, "I knew I was wrong." I said, "Nobody's gonna hit you." I said, "Listen, nobody's gonna…"

█████ :     ████████ That was his name, right? █████

MM:     Yeah. █████ I said, "Nobody's gonna hit you. Nobody's gonna do nothing." I said, "We're, just… you know, we can work it out," I said. "There's no problem." He said, "I'm back. I'm back for good." He says, "I was in Florida. I got arrested, you know. Blah. Blah. Blah." He said…

█████ :     Where'd you see him?

MM:     I caught him on ████████ Avenue.

█████ :     No shit?

MM:     And I know where he, and I know where he works part-time in the florist over here. He works, ironically, he works in a ████████████████.

█████ :     That's funny.

MM:     Yeah. So. He gave me his number. He said, "Call me after the holidays." I said, "You gonna answer the phone?" I said, "I'll find you." "No, no, no, Mike. I don't want no trouble." He says, "I know you're, uh, what-do-ya-call-it." He says, "Please, we'll, uh, we'll get back on track." I said, "All right, █████ " I said, "Nobody wants to hurt nobody. We just want you to do the right thing." You know? I don't want to hit him, you know?

█████ :     Yeah.

MM:     If I hit him, he's a big boy. But it's unbelievable, huh? Sooner or later, you get them all.

█████ :     Took what? Two, three years, no?

10

MM:    Yeah. Yeah. You know what? But it pays to be patient. He said, "Why didn't you call me?" I said, "Why didn't I call you? Are you for fucking real?" I says, "You're lucky I didn't catch you then because you weren't answering the phone. Weren't answering the phone. You were fucking, uh, avoiding me." I said, "You're lucky I didn't catch you then, I would've put a baseball bat over your head." I said, "But now… you know, you see how I called you over, you said, 'Hi Mike.' So easy. Nobody's looking to hurt nobody." I said, "We gotta straighten out things. That's it."

        ****

Based on my training, experience, and participation in this investigation, I believe that, in the above conversation, Messina is recounting an interaction with a loansharking victim, █████ who failed to pay on his debt for the last two to three years. During the call, Messina recounts his threats of violence, and references the victim's belief that failure to repay would result in such violence.

    b.  On February 8, 2020, at approximately 7:12 a.m., a phone call was intercepted between Messina and ███████, using telephone number ████████. (Line 9545, Ref #2954). Their conversation is transcribed in part below:



MM: Michael Messina
████████

    ****

██ :    How are you?

MM:    I'm not good. How are you?

██ :    Yeah, I'm, I'm just, it's, it's, it's just…

MM:    ███████████. Have I been a good guy to you? Have I been the best?

██ :    Yes.

MM:    Okay. I'm tired of getting fucked in my ass. I'm tired of it.

██ :    No, it's…

MM:   No. ████████. You don't understand. I've been helping for the longest time. You have not even attempted to help me. Not even a fucking iota. It's always, there's always a problem. Always a problem. I've been nothing but good to you. Nothing…

███:   I know. I know.

MM:   I know- You don't know. Because I've been very, very patient. Now, I'm getting aggravated. More than aggravated. I want to see you today. At breakfast. I can't talk to you the way that… I am more than aggravated. I, I'm willing to work with you one hundred percent, but this is fucking ridiculous.

███:   I'm so…I'm… I'm… I don't know what to do.

MM:   Don't apologize. Don't apologize. I'm tired of you apologizing.

███:   No, I don't even, I don't even have… I have ninety dollars on me. I mean, I don't know what to do.

MM:   ████████. I want to see you. I want to talk to you today. I'm in the Bronx today, okay?

███:   I'll come in.

MM:   I want to talk to you. I'll see you at nine thirty, all right?

███:   All right.

\*\*\*\*

Based on my training, experience, and involvement in this investigation, I believe that, in the above call, Messina spoke to ████ a loansharking victim, regarding ████ delinquent loan payment. During their conversation, Messina indicated that he was growing frustrated that he had exercised patience in waiting for ████ payments, but that, now, he was "aggravated." Messina then demanded to meet with ████ that day at breakfast. ████ explained that he did not know what to do because he had only "ninety dollars" on him. Messina explained he would talk to him in person at 9:30 a.m., though he did not specify a meeting location.

c.   On May 28, 2020, at approximately 10:50 a.m., a call was intercepted between Messina and an individual referred to as ███ using the telephone numer ████████ (Line 9267, Session 613).  The conversation is transcribed in part below:

███   [. . .] [O]nly good news I have is in two weeks I start working, thank God.

MM:   Good, very good.

███   I'll tally it up and at least try to give you at least more than five.

MM:   I'll talk to you, I'll talk to you when I see you.

███   Yeah but in two weeks I at least start working and doing the labor.

MM:   Yeah good, good, good.

[…]

Based on my training, experience, and participation in this investigation, I believe that ███ is one of Messina's loansharking victims and the same ███ that Messina previously discussed with ████ *See supra* ¶ 17(a).  I also believe that in this call, ███ is promising he will be able to repay Messina more than $5,000 when he restarts work to catch up on overdue payments.

18.   The Wiretaps have also included interceptions in which Messina has discussed his loansharking business with other LCN members.  The following are some examples:

a.   On June 9, 2020, at approximately 11:05 a.m., a phone call was intercepted between Messina and Nicholas Calisi, using the number 347-419-4015. (Line 9267, Session 1122).  The conversation, in substance and in part, went as follows:

MM:   What's up buddy?

NC:   What's the date of the party?

MM:   Ahh

NC:   The date

13

MM:   I think it was, I don't have the date, it's 16

NC:   16

MM:   Yeah its ahh

NC:   Alright so so okay

MM:   Four months yeah

NC:   Yeah

*****

I believe that Calisi is a Captain in the Genovese Family. I also believe that Messina and Calisi were discussing, in coded terms, an outstanding loan, and the length of time that "vig" has been owed on this loan. Calisi asks about the "date of the party," i.e., the amount owed, and then Messina responds that "it's 16," based on "four months" of payments.

19.    More recently, the Wiretaps have included interceptions in which Messina discusses contact he had with law enforcement and its impact on his loansharking operation and on other LCN members. On or about June 30, 2020, law enforcement agents involved in this investigation made contact with Messina. Agents inquired about a particular individual on Mulberry Street to whom Messina had previously extended a loan. In response to agents' questions about this individual owing Messina money, Messina made up a story about the money arising out of a legitimate work relationship.

20.    Based on my involvement in the investigation, including my review of calls intercepted through the Wiretaps, I have learned that, consistent with LCN rules, Messina promptly reported this contact to Ralph Balsamo, a Captain in the Genovese Family, and has subsequently kept a distance from other LCN members, as illustrated in the following examples:

14

a.   On or about June 30, 2020, at approximately 2:37 p.m., a call was intercepted between Messina and Balsamo using phone number 347-584-3409.  (Line 9267, Session 1877). The conversation is transcribed in part below:

MM:   Yeah, it caught up to me.

RB:   What happened?

MM:   That guy, the guy that caused all this problem.

RB:   Yeah.

MM:   Yeah it caught up to me. They caught me on 684. They pulled me over.

RB:   They pulled you over.

MM:   Yup.

RB:   When?

MM:   Today just now. They wanted to know about that guy in Brooklyn.

RB:   You mean that kid, that kid --

MM:   Yup, yup

RB:   Really. . .

MM:   Yup, yup, they asked me if I knew that guy out there.

RB:   The big guy, the tall guy.

[…]

MM:   No, no they got me, they got me with this kid. […] This kid is giving up everybody.

[…]

RB:   They didn't mention, they didn't mention anybody else or anything. . .

MM:   No [. . .] And they said okay here here's our number if you think if anything call us. If we have any questions, give me your number so I gave them my number. What am I gonna do?

RB:     Not this number right?

MM:     No are you out of your fucking mind.

After Messina reported his law enforcement contact to Balsamo, Balsamo, in turn, conveyed that he would tell "Nick," referring to Nicholas Calisi, another Captain in the Genovese Family. During the conversation, Balsamo inquires about whether law enforcement agents inquired about "anybody else or anything," which I believe refers to other members of LCN. In other words, Balsamo confirmed that Messina was not asked, and did not say anything about, any other members of the Genovese Family.

b.   On or about July 23, 2020, at approximately 10:35 a.m., a call was intercepted between Messina and Michael Poli using phone number 646-200-2087. (Line 4979, Session 35). The conversation is transcribed in part below:

MP:     Hello

MM:     What are you doing Buddy?

MP:     Hey what's up?

MM:     Did that other guy change his number

MP:     Who, our friend?

MM:     Yeah

MP:     Not that I know of, no.

MM:     Cause I tried calling him and I keep on getting . . . I don't know, someone sent me a question mark.

MP:     From his phone?

MM:     From his phone.

MP:     Well I'm going to try him, I'll call you right back.

MM:    Alright, just tell him I wanted to let him know everything is good, nice and quiet.

MP:    Ok.

Based on my training and experience, and participation in this investigation, I believe that since his contact with law enforcement, Messina has attempted to distance himself from other LCN members.  For example, in this communication, I believe that Messina is asking Michael Poli to convey a message to Ralph Balsamo – referred to as "our friend," which is how Messina and Poli commonly refer to Balsamo.  In the context of his recent interaction with law enforcement agents, I further believe that Messina is attempting to communicate to Balsamo, through Poli, that he has not had any further interaction with law enforcement, *i.e.*, "everything is good, nice and quiet."

    c.   On or about July 27, 2020, at approximately 1:36 p.m., a call was intercepted between Messina and Ralph Balsamo using phone number 347-584-3409.  (Line 3409, Session 1366).  The conversation is transcribed in part below:

    ****

RB    How's everything?

MM:    Everything has been so quiet, you know.

RB:    Good, good. Quiet's good.

MM:    Quiet, good.

RB:    Yeah

MM:    Yeah I don't want to go around nobody.

RB:    No.

MM:    [Unintelligible]

RB:     That's being smart.

MM:     Yeah.

RB:     Everybody loves you, everybody loves you, everybody misses you.

MM:     And I love everybody.

RB:     It's just being smart pal, that's the right way.

*****

Based on my training and experience, and participation in this investigation, I believe Balsamo and Messina are discussing that, following Messina's contact with law enforcement, Messina is staying away from other LCN members, consistent with LCN rules and his position as a Genovese Soldier.  I understand that, in their conversation, Balsamo is reassuring that other LCN members support Messina and confirming that Messina should keep a distance from other LCN members (*e.g.*, "that's the right way").

21.     Based on information provided by CS-1, I believe that as a result of Messina's contact with law enforcement, he has transitioned some of the day-to-day operations (including debt collection) to Michael Poli, a Genovese Associate. ████████████████████ ██████████████████████████████████ Messina described to CS-1 his interactions with the agents and indicated, in sum and substance, that he did not want to go to jail. Messina further indicated that he was going to have "the kid" make collections for him, which I believe refers to Poli.  This is confirmed by the Wiretaps, as well as pole camera footage and physical surveillance.

a.  For example, on July 22, 2020, at approximately 1:19 p.m., a call was intercepted between Messina and Michael Poli (Line 4979, Session 24).  During the course of the conversation,

Messina asked Poli if he was still on vacation, and Poli said that he was but that he would be coming home the next night.  Messina explained: "Oh nice, alright.  Uh, Monday we'll meet.  I'm not coming down Saturday.  I'll meet you Monday."  Messina further stated: "Meet me on ████ Avenue. Remember where I used to live?  Right on the corner.  I have a friend, I'm, I'm going to introduce you to somebody so you could, you know . . .  I'll talk to you then."  Poli responded: "alright."

        b.   Subsequently, on July 27, 2020, beginning at approximately 10:59 a.m., several text messages were intercepted between Messina and Michael Poli, including the following:

| | | |
|---|---|---|
| MP: | I'm here the address is ████ Ave. my truck is parked in front | |
| MM: | Ok | |
| MP: | On corner | |

        c.   Law enforcement agents conducting surveillance in the vicinity of ████ Avenue, Bronx, New York observed Messina and Poli separately enter a residence at that address, as well as have a short conversation outside of that address.  Based on a review of information in law enforcement databases, I believe that ████ one of Messina's loansharking victim ████ at that address.

<u>*Probable Cause Justifying Search of the Subject Premises*</u>

        22.   As detailed more fully below, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the Subject Premises.

        23.   The Subject Premises is Messina's residence and has been since at least 2017.  This has been confirmed by physical surveillance, information provided by CS-1, cellphone location information obtained pursuant to the Wiretaps, and tax records.  On September 16, 2020, agents

conducting surveillance outside of the Subject Premises observed two vehicles belonging to Messina parked in the driveway of the Subject Premises. More specifically, they observed a white Cadillac XTS with New York registration HXU3466. As part of this investigation, agents have observed Messina driving this Cadillac. In addition, this Cadillac is registered to Messina but at a Bronx address believed to be a property that Messina recently sold. Agents also observed a Nissan Frontier pickup truck with Connecticut registration AX93362. This car is registered to Messina at the Subject Premises. In addition, agents observed three plastic or rubber trash barrels marked "B" located down the road from the Subject Premises. Loose trash was inside the barrels, including mail addressed to "Jenny Messina" at the Subject Premises. Jenny Messina is known to be Messina's wife. Messina lives at the Subject Premises with members of his family.

24.     Messina is known to store proceeds of the Subject Offenses at the Subject Premises. For example, ███████████████, at Messina's direction, CS-1 picked up a loan payment from ████████████ a loansharking victim, at ███████████████████ ███████████████ Based upon information provided by CS-1, as well as an intercepted communication over Messina's cellphone (Line 9545, Ref # 5899), at approximately 1:15 p.m. on the same date, Messina directed CS-1 to come to the Subject Premises. I am further informed by CS-1 that: at approximately 1:37 p.m. on the same date, CS-1 went to the Subject Premises and Messina's wife granted CS-1 access to the Subject Premises through the garage. CS-1 then met Messina in the living room, providing him with ███████████ payment, contained in a sealed envelope, as well as CS-1's two weekly loan payments totaling $6,140 in cash.

25.     Based upon intercepted communications through the Wiretaps, cellsite location information, and physical surveillance, I have observed that, as recently ████████████████

Messina returned to the Subject Premises immediately after meeting CS-1 to receive a large cash payment in connection with money owed on a loan.

    a.   Specifically, on or about ███████████ CS-1 met Messina in ███████████ ████ and made a vig payment in the amount of $4,070 in cash. Based on physical surveillance conducted of the meeting, I am aware that Messina was at the meet location between approximately 6:05 p.m. and 6:40 p.m. Cellsite location information for Messina's phone show, in substance and in part, the following pings: at 5:26 p.m., Messina was in the vicinity of the Subject Premises; at 5:41 p.m., Messina was on Penbrook Road in Fairfield, Connecticut; at 6:11 p.m., at 6:26 p.m., and at 6:41 p.m., Messina was in ███████████ in the vicinity of the meeting location; and at 6:56 p.m., Messina was in the vicinity of the Subject Premises.   Based on my review of the cellphone pings and familiarity with the area, I believe that Messina went directly from the meeting with CS-1 to the Subject Premises.

    b.   In addition, on or about ███████████ beginning at approximately 10:51 a.m., CS-1 met with Messina in a park in the ███████████ and provided a vig payment in the amount of $3,070 in cash.  Cellsite location information show, in substance and in part, the following pings: at 8:38 a.m., Messina was in the vicinity of the Subject Premises; at 9:55 a.m., Messina was in the ███████████; at 10:52 a.m. and at 11:12 a.m., Messina was in the park where he met CS-1; and by 11:31 a.m., Messina had left the park.  The cellsite location information shows that Messina eventually returned to the Subject Premises by 4:58 p.m.  Based on my involvement in this investigation and familiarity with Messina's patterns of behavior, I have learned that Messina arranges to meet other LCN members for lunch or coffee during his visits to the city.  Accordingly, I believe that the cellsite location information is consistent with Messina retrieving the cash

payment from CS-1, engaging in various social activities, and then returning home to the Subject Premises with the cash payment.

26.     I am also aware that, in the last three months, CS-1 has provided Messina with numerous large cash payments on the following occasions: On or about ▮▮▮▮▮▮ CS-1 met Messina in the ▮▮▮▮▮▮▮ and provided a vig payment in the amount of $6,140.  On or about ▮▮▮▮▮▮ CS-1 met with Messina in ▮▮▮▮▮▮▮, and provided a vig payment in the amount of $4,070.  On or about ▮▮▮▮▮▮▮ CS-1 met Messina in ▮▮▮▮▮▮▮ and provided a vig payment in the amount of $4,070.  Because these meetings occurred during periods of time when the Wiretaps were not up, cellsite location information for Messina is not presently available.

27.     Based upon intercepted communications through the Wiretaps, I have also learned that, on or about June 16, 2020, Messina sent a text message to Ralph Balsamo, a Captain in the Genovese Family, stating, in part: "Do you want to laugh they threw me out of the bank[.]"  Based on my training, experience, and review of this and other similar communications, I believe that Messina recently learned that JP Morgan Chase had closed his accounts, and informed Balsamo. Based on the nature of his business, his fear of law enforcement detection, and his inability to use at least one bank, I believe that Messina is now likely to maintain most of the proceeds in his home, *i.e.*, the Subject Premises.

28.     Based upon my training, experience, and participation in this investigation, including information provided to me by other law enforcement officers participating in this investigation who have decades of experience investigating LCN and the Subject Offenses, I know the following:

a.   Those who engage in loansharking and extortion keep records of their transactions in order to track and document scheduled and completed payments and to record the identity, addresses, and telephone numbers of victims and criminal associates. Additionally, I am aware that individuals, such as Messina, who collect cash payments from numerous loansharking victims, each of whom pays different amounts on various schedules, often record this information. Additionally, as we have identified at least ▮▮▮▮▮ loansharking victims from whom Messina collects regular payments, we believe he is keeping records pertaining to each victim, such as the loan amount, repayment schedule, and payments made.  In my experience, individuals who engage in these types of activities routinely store such records in a secure location and one where they are easily accessed in the event of a dispute with a loansharking victim or co-conspirator, such as a residence.  Messina's interactions with the loansharking victim ▮▮▮▮ *supra* ¶ 17, further suggest that Messina retains records of outstanding debts going back more than two to three years.

b.   Individuals who commit racketeering offenses such as loansharking and extortion typically keep certain items in their homes, cars, and other private locations.  Like other business people, individuals who engage in loansharking and extortion typically keep paper or electronic records for long period of time that would constitute evidence of the unlawful activity.  Such records often include accounting records, ledger books and sheets, notations, records of debts owed to or by others involved in the illegal activity, bank statements and receipts, tax returns evidencing a lack of legitimate income or efforts to disguise unlawful proceeds, and other documents helpful in tracing the path of illegal proceeds after unlawful transactions are conducted.

c.   Individuals engaged in racketeering activities like loansharking and extortion also often keep in paper or electronic form, phone and address books, lists of contacts, and call sheets

23

or call logs, which are often helpful in establishing links between individuals suspected of criminal activity or identifying the victims of criminal activity.

d.   I also know that those individuals often keep records like those above on their cellphones and computers, including laptop computers and thumb drives.  Those documents and records may provide information about those persons, the crimes themselves, as well as information about the execution of the schemes.

e.   Individuals engaged in loansharking and extortion often maintain bulk cash on hand for carrying out their unlawful activity.  Such cash may kept on hand to invest in new ventures – such as the principal for a new loan – or it may constitute the proceeds of unlawful activity.  Like cash, property such as jewelry, art, and other valuable goods are often accepted by loansharks as payment from business associates.

f.   Additionally, I know that many of the items listed above are often stored in closed containers, such as safes, key-lock strong boxes, suitcases, hidden compartments, and other instruments, which are further secured by combination and/or key locks of various kinds.

*Probable Cause Justifying Search of Electronic Devices Found in the Subject Premises*

29.   Based on my training and experience, I know that individuals who engage in organized crime commonly use cellphones and other electronic devices to contact co-conspirators and to conduct crimes, and that there is likely to be evidence of crimes and illegal association with a RICO enterprise in a cellphone belonging to or used by a member or associate of organized crime.  And as also discussed above, Messina has in fact used cellphones to engage in the Subject Offenses.

30.     In addition, because Messina has been intercepted using several of his cellphones to discuss, plan, and commit the Subject Offenses, those cellphones are themselves evidence and instrumentalities of the Subject Offenses.  To identify seized cellphones as those that were intercepted, it is necessary to search of the cellphones for their unique identifiers, to include their call number, IMSI and/or IMEI.

31.     Based on my training and experience, I also know that, where cellphones are used in furtherance of criminal activity, evidence of the criminal activity can often be found months or even years after it occurred.  This is typically true because:

- Electronic files can be stored on a cellphone for years at little or no cost and users thus have little incentive to delete data that may be useful to consult in the future.

- Even when a user does choose to delete data, the data can often be recovered months or years later with the appropriate forensic tools. When information is "deleted" on certain types of cellular phone, the data contained in the file does not actually disappear, but instead remains on the device until it is overwritten by new data that cannot be stored elsewhere. Thus, the ability to retrieve from electronic storage media depends less on when the file was created or viewed than on a particular user's operating system, storage capacity, and habits.

- In the event that a user changes cellphones, the user will often transfer files from the old phone to the new phone, so as not to lose data.

### *Procedures for Searching ESI*

32.     Federal Rule of Criminal Procedure 41(e)(2)(B) provides that a warrant to search for and seize property "may authorize the seizure of electronic storage media or the seizure or copying of electronically stored information . . . for later review."  Consistent with Rule 41, this application requests authorization to seize any electronic devices and transport them to an appropriate law enforcement facility for review.  This is typically necessary for a number of reasons:

- First, the volume of data on electronic devices is often impractical for law enforcement personnel to review in its entirety at the search location.

- Second, because data is particularly vulnerable to inadvertent or intentional modification or destruction, such devices are ideally examined in a controlled environment, such as a law enforcement laboratory, where trained personnel, using specialized software, can make a forensic copy of the storage media that can be subsequently reviewed in a manner that does not change the underlying data.

- Third, there are so many types of hardware and software in use today that it can be impossible to bring to the search site all of the necessary technical manuals and specialized personnel and equipment potentially required to safely access the underlying electronic data.

- Fourth, many factors can complicate and prolong recovery of data from an electronic device, including the increasingly common use of passwords, encryption, or other features or configurations designed to protect or conceal data on the device, which often take considerable time and resources for forensic personnel to detect and resolve.

33.   Following seizure of any electronic devices, law enforcement personnel (including, in addition to law enforcement officers and agents, and depending on the nature of the ESI and the status of the investigation and related proceedings, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) will review the records for evidence, fruits, and instrumentalities of the Subject Offenses as specified in Attachment B to the proposed warrant, which is incorporated by reference herein.

34.   In conducting this review, law enforcement personnel may use various techniques to determine which files or other ESI contain evidence or fruits of the Subject Offenses.  Such techniques may include, for example:

- surveying directories or folders and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files);

- conducting a file-by-file review by "opening" or reading the first few "pages" of such files in order to determine their precise contents (analogous to performing a cursory examination of each document in a file cabinet to determine its relevance);

- "scanning" storage areas to discover and possibly recover recently deleted data or deliberately hidden files; and

- performing electronic keyword searches through all electronic storage areas to determine the existence and location of data potentially related to the subject matter of the investigation ; and

- reviewing metadata, system information, configuration files, registry data, and any other information reflecting how, when, and by whom the device was used.

35.     Law enforcement personnel will make reasonable efforts to restrict their search to data falling within the categories of evidence specified in the warrant.  Depending on the circumstances, however, law enforcement personnel may need to conduct a complete review of all the ESI from any seized device to evaluate its contents and to locate all data responsive to the warrant.

36.     If the Government determines that the electronic devices are no longer necessary to retrieve and preserve the data, and the devices themselves are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41(c), the Government will return these items.  Electronic data that is encrypted or unreadable will not be returned unless law enforcement personnel have determined that the data is not (i) an instrumentality of the offense, (ii) a fruit of the criminal activity, (iii) contraband, (iv) otherwise unlawfully possessed, or (v) evidence of the Subject Offenses.

## **CONCLUSION**

37.     As set forth above, there is probable cause to believe and I do believe that Target Subject Michael Messina has committed the Subject Offenses and that the items described in

Attachment B, which constitute evidence, contraband, fruits, or instrumentalities of the Subject Offenses, exist at the Subject Premises.

38.     I believe that public disclosure of the this Affidavit or the requested search warrant and search warrant applications may compromise the ongoing investigation; cause potential witnesses to flee or not come forward in fear of prosecution; cause individuals to destroy physical evidence or conceal proceeds of criminal activity; and jeopardize the safety of law enforcement officers executing those warrants.  I therefore respectfully request that the Court order that this Affidavit, the requested arrest warrant, and search warrants be sealed under further order of the Court, except that a copy of these materials may be provided to defense counsel for purposes of discovery.

Sarah Lingsch
FBI Special Agent

Sworn to me through the transmission of this Affidavit by reliable electronic means, pursuant to Federal Rules of Criminal Procedure 41(d)(3) and 4.1 on this 16th day of September, 2020.

s/William I. Garfinkel

HON.   /ILLIAM I. GARFINKEL
UNITED STATES MAGISTRATE JUDGE

**<u>ATTACHMENT A</u>**

**PLACE TO BE SEARCHED**

The Subject Premises are particularly described as a tan single-family home with white trim and a stone foundation, located at 1B Austin Drive, New Fairfield, CT. (see Photograph below). The front door of the Subject Premises is accessed via a walkway to a covered front porch surrounded by a white railing. (see Photograph below)



## ATTACHMENT B

## DESCRIPTION OF ITEMS TO BE SEIZED

The items to be seized from the Subject Premises consist of the following evidence, fruits, and instrumentalities of racketeering conspiracy, in violation of 18 U.S.C. § 1962(d) and extortion (including extortionate extensions of credit, extortionate debt collection, and financing of the same), in violation of 18 U.S.C. §§ 892, 893, 894, and 1951 (the "Subject Offenses") described as follows:

a.  Evidence concerning occupancy or ownership of the Subject Premises, including without limitation titles, utility and telephone bills, mail envelopes, addressed correspondence, identification documents, and address books;

b.  Evidence concerning the identity or location of, and communications with, co-conspirators, including without limitation photographs, diaries, contact lists, and address books;

c.  Evidence concerning the identity or location of, and communications with, victims or intended victims, including without limitation photographs, contact lists, address books, and ledgers or other records of debts;

d.  Evidence concerning extortion and the extortionate extension of credit (loansharking), including but not limited to, bank accounts, lists of debtors, ledgers;

e.  Evidence of proceeds of the Subject Offenses, including without limitation United States or foreign currency, ledgers or other records of debts, bank statements, receipts, tax returns evidencing the absence of legitimate income, property such as jewelry, art, fine furniture, and other *valuable* goods which would constitute evidence of unexplained wealth;

f.  Evidence concerning safety deposit boxes, storage units, or ownership of other real estate where evidence, fruits, or instrumentalities of the Subject Offenses might be found;

g.  Any safes, key-lock strong boxes, and other types of locked or closed containers that may contain any of the items described in paragraphs (a) through (f) above; and

h.  Any cellular phones and SIM cards, which have indicia of ownership, dominion, or control by the Target Subject, to be searched for any of the items described in paragraphs (a) through (f) above, as well as:

1.  Evidence of who used, owned, or controlled the electronic device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords,

documents, browsing history, user profiles, email, email contacts, "chats," instant messaging logs, photographs, and correspondence;

2. Evidence of the times the electronic device was used;

3. Passwords, encryption keys, and other access devices that may be necessary to access the electronic device;

4. Documentation and manuals that may be necessary to access the electronic device or to conduct a forensic examination of the electronic device;

5. Contextual information necessary to understand the other information recovered.